```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/7/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SCARSDALE CENTRAL SERVICE INC.,                      :
                                                     :
                              Plaintiff,             :        13-cv-8730 (NSR)
        -against-                                    :
                                                     :        MEMORANDUM AND ORDER
CUMBERLAND FARMS, INC. and GULF OIL                  :
LIMITED PARTNERSHIP,                                 :
                                                     :
                              Defendants.            :
-------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge

        Plaintiff Scarsdale Central Service Inc. ("Plaintiff") is a tenant and franchisee of

Defendants Gulf Oil Limited Partnership ("Gulf Oil") and Cumberland Farms, Inc.

("Cumberland") (collectively "Defendants"), operating a Gulf gas station at 880 Central Park

Avenue in Scarsdale, New York ("Premises"). Gulf Oil is a subsidiary of Cumberland. Plaintiff

filed suit against Defendants and other parties seeking, among other remedies, to enjoin the sale

of the Premises to former defendant 880 Central Park Avenue LLC ("880 CPA"), to enjoin

Defendants from evicting Plaintiff from the Premises, to prevent Defendants from terminating

the franchise relationship, and to order Defendants to honor Plaintiff's right of first refusal under

terms consistent with a bona fide arm's length transaction. Plaintiff also seeks a declaration that

the sales agreement between Cumberland and 880 CPA is invalid, and damages under various

tort and contract theories. Defendants asserted counterclaims against Plaintiff, including a

trademark infringement claim under the Lanham Act, 15 U.S.C. § 1114(1), and a claim seeking a

declaration that Defendants' actions satisfied the nonrenewal requirements of the Petroleum

Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2802, 2804.

Defendants' now move for a preliminary injunction seeking an order that Plaintiff vacate and surrender the Premises, return to Defendants all property belonging to them, and remove Plaintiff's personal property without harming the Premises.  On March 3, 2014, the Court held a hearing and heard oral argument on this motion.  For the reasons set forth below, Defendants' motion for a preliminary injunction is granted.

## I. FACTS

Until 2001 the Premises was owned by non-party Exxon Corporation, and non-party J&V Central Service, Inc. ("J&V") operated the gas station as an Exxon franchisee.  Cumberland bought the Premises from Exxon and J&V became a Gulf franchisee.  On or about December 1, 2010, J&V entered into the most recent franchise and lease agreements with Gulf Oil concerning J&V's occupancy of the gas station.  These agreements were to expire on November 30, 2013. On April 19, 2012, J&V assigned to Plaintiff the Gulf franchise and lease agreements.

Former defendants David Ross ("Ross") and Richard Becker ("Becker") own 880 CPA and its parent Patio.com, a furniture store.  On or about October 18, 2012, before forming 880 CPA, Ross made an unsolicited offer to Cumberland to purchase the Premises.  On or about June 19, 2013, Cumberland's Real Estate Manager, JoAnne Miller ("Miller") emailed Plaintiff's principal Jim DeRentis ("DeRentis") acknowledging Plaintiff's interest in purchasing the Premises.  Miller stated,

> As we discussed, there is a contract being negotiated at $1.3 million.  Once all terms and conditions have been agreed to . . . you will be given a signed copy of the Purchase and Sales Agreement. . . . [I]f you are interested in submitting an offer please send it to my attention.

(Defs.' Reply Ex. A.)  The negotiations referenced were with Ross and Becker.  On June 26, 2013, Cumberland's Director of Real Estate Acquisitions and Divestments, Deborah Gonsalves

("Gonsalves"), informed Plaintiff by letter that Cumberland was divesting ownership of the
Premises and was granting Plaintiff 30 days to submit an offer to purchase the property.
Gonsalves stated that Cumberland was not obligated to accept Plaintiff's offer, but that if
Cumberland contracted with a third party, Plaintiff retained its right of first refusal under the
PMPA.  Gonsalves also noted that Cumberland would not accept any offers prior to the
termination of this 30-day period.

On June 28, 2013, Gulf Oil through its Regional Director of Dealer Sales Operations and
Property Management, Rich Watts ("Watts"), wrote Plaintiff that the franchise would terminate
October 7, 2013, because Plaintiff did not keep the gas station open from 6:00 a.m. and midnight
for at least 7 days.  This letter was sent on joint Cumberland and Gulf Oil letterhead.  DeRentis
avers that Plaintiff ceased operations for four months in fall and winter 2012 because
Cumberland required Plaintiff to close the gas station so Cumberland could install new oil
storage tanks.  Aside from this June 28, 2013, letter, nothing more happened with respect to
terminating Plaintiff's franchise for the alleged failure to operate.

On July 25, 2013, Plaintiff submitted an offer of $800,000 to buy the Premises, equal to
the August 16, 2010, appraisal value upon which Plaintiff's rent was based.[1]  By letter dated
August 27, 2013, Watts notified Plaintiff that Cumberland had accepted 880 CPA's offer of $1.3
million.  Upon receipt of Watt's letter, Plaintiff had 45 days to exercise its right of first refusal by
making an offer to purchase the Premises at the same purchase price.  Watts informed Plaintiff
that the franchise would be "terminated and non-renewed effective December 9, 2013," 109 days
later.  (Miller Aff. Ex. 2.)  Watts attached a copy of the Revised Summary to Title I of the PMPA

---

[1] Rent increased annually throughout the term of the lease, as the value of the Premises was assumed to increase by
3% annually.  Thus, for December 1, 2012, through November 30, 2013, rent was based on a property value of
$848,720.

as published in the Federal Register, as well as a copy of the sales contract with 880 CPA. The agreement with 880 CPA required a down payment of $750,000, with the remaining amount due at closing.

On October 11, 2013, Plaintiff filed the instant action in Westchester County Supreme Court. Plaintiff through counsel also sent a letter to Watts outlining its theory that Defendants were conspiring with former defendant and fellow Gulf franchisee Syed Kirmani ("Kirmani") to divest Plaintiff of its franchise, in violation of the PMPA. In its letter, Plaintiff asserted that the $750,000 down payment was highly unusual and made purposely so that Plaintiff could not exercise its right of first refusal, as Plaintiff would be unable to make such a down payment due to its financial situation. Notwithstanding its accusations, Plaintiff purported to elect to exercise its right of first refusal to match 880 CPA's $1.3 million offer.[2]

On October 24, 2013, Watts by letter acknowledged Plaintiff's wish to exercise its right of first refusal, and informed Plaintiff that it would receive the same contract as 880 CPA except the down payment would be reduced to $130,000 to account for Plaintiff's financial condition. On October 28, 2013, Gonsalves on behalf of Cumberland sent Plaintiff's counsel a proposed purchase and sale agreement for the Premises with the new down payment amount. The remainder of the purchase price would still be due at closing. The only other difference was the inclusion of a Mutual Termination and General Release Agreement ("Mutual Termination") form attached to the sales contract. The Mutual Termination provides,

> in consideration of Gulf [Oil] agreeing to relieve [Plaintiff] from the operation of
> [its] Retail Motor Fuel Outlet and to terminate all Contracts and Agreements, . . .

---

[2] Both in this letter and at oral argument, Plaintiff's counsel stated this exercise was subject to the Court's determination of the claims in the instant action concerning the validity of the sales contract between Cumberland and 880 CPA. In other words, Plaintiff would buy the Premises if the Court finds no malfeasance on Cumberland's part.

> [Plaintiff] releases Gulf [Oil] from any and all claims and causes of action which [Plaintiff] has or might have against Gulf [Oil], irrespective of the source thereof, and whether such claims or causes of action are now known or unknown.

(Pl.'s Ex. F at 9.)  Gonsalves requested that Plaintiff sign and submit the agreement, along with the down payment, by November 6, 2013.

On November 7, 2013, having not heard from Plaintiff, Gonsalves called Plaintiff's counsel to determine whether Plaintiff would purchase the Premises.  Plaintiff's counsel allegedly raised the conspiracy accusations again and failed to discuss the proposed sales agreement.  On November 8, 2013, Gonsalves wrote to Plaintiff's counsel requesting a response to the sales agreement by November 15, 2013, and noted that Plaintiff's failure to respond would be deemed its refusal to proceed with the purchase of the Premises.  Gonsalves noted she was available to discuss the agreement with Plaintiff's counsel but would not discuss other issues.

On or about December 9, 2013, the date upon which the nonrenewal of Plaintiff's franchise was to take effect, Defendants removed the instant action to federal court after failing to hear from Plaintiff or Plaintiff's counsel.  To date, Plaintiff continues to occupy the Premises without paying rent, purchases gasoline from an unknown vendor, sells gasoline on the Premises, and continues to use the trademarked Gulf logo.  At oral argument, Plaintiff conceded that on at least one occasion Plaintiff allowed an underground storage tank to be filled above its safe fill level.

## II. DISCUSSION

Defendants seek a preliminary injunction requiring Plaintiff to (a) immediately vacate the Premises and surrender the gas station, (b) immediately return all Defendants' equipment, fixtures, and other personal property, and (c) immediately remove Plaintiff's personal property without harm to the Premises.  In the Second Circuit,

> to obtain a preliminary injunction the requesting party must demonstrate:
> (1) irreparable harm; and (2) either (a) likelihood of success on the merits or
> (b) sufficiently serious questions going to the merits of the case to make them a
> fair ground for litigation and a balance of hardships tipping decidedly toward the
> party requesting preliminary relief.

*LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 54 (2d Cir. 2004); *accord Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35, (2d Cir. 2010).  Where the moving party demonstrates a likelihood of success on the merits, the balance of hardships must tip in its favor, though not decidedly so.  *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 194 (E.D.N.Y. 2013) (citing *Windsor v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."); *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)).  The moving party must also show "that the public interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (citing *Windsor*, 555 U.S. at 20)).

## A. Likelihood of Success on the Merits

### 1. PMPA Counterclaim

In their counterclaimDefendants seek a determination that nonrenewal of Plaintiff's franchise was properly effected.  Under the PMPA, "[p]rior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification . . . to the franchisee . . . (2) . . . not less than 90 days prior to the date on which such termination or nonrenewal takes effect." 15 U.S.C. § 8204(a)(2).  Upon giving written notification, the franchisor must send notification by certified mail or hand delivery and must state its intent to

terminate or not renew, the reasons for termination or nonrenewal, the effective date thereof, and

a summary statement published in the Federal Register.  15 U.S.C. § 8204(c); *see also* 61 Fed.

Reg. 32,786 (summary of PMPA Title I as set out by Department of Energy).  Grounds for

nonrenewal include "a determination by the franchisor in good faith and in the normal course of

business . . . to sell [the] premises . . . ."  15 U.S.C. § 8202(b)(3)(D)(i)(III).[3]  Where the premises

are leased to the franchisee, the franchisor must also "offer[] the franchisee a right of first refusal

of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in

such premises."  *Id.* § 8202(b)(3)(D)(iii)(II).  The statute's "good faith" test is meant "to preclude

sham determinations from being used as an artifice for termination or non-renewal."  *Darling v.*

*Mobil Oil Corp*, 864 F.2d 981, 990 (2d Cir. 1989) (quoting S. Rep. No. 95-731 (1978), *reprinted*

*in* 1978 U.S.C.C.A.N. 873, 896).  Its "normal course of business" test requires that the

franchisor's decision be "the result of the franchisor's normal business decision making

process."  *Id.*  These tests provide protection from arbitrary and discriminatory nonrenewal yet

"avoid judicial scrutiny of the business judgment itself."  *Id.*

Here, Defendants assert they are likely to succeed on their counterclaim because (1) they

determined to sell the Premises in the normal course of business, (2) they offered Plaintiff the

right of first refusal of 880 CPA's offer and gave Plaintiff 45 days to exercise the right, and

(3) they gave Plaintiff 109 days' notice of nonrenewal in writing by certified mail *and* hand

delivery stating the reason for the nonrenewal (namely, the decision to sell the Premises), giving

the date nonrenewal would take effect, and providing the summary statement set out by the

---

[3] Separate grounds for termination or nonrenewal include "failure by the franchisee to operate the marketing
premises for (A) 7 consecutive days . . . ."  15 U.S.C. § 8202(c)(9)(A) (explaining "an event which is relevant to the
franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise
relationship is reasonable" as contemplated in 15 U.S.C. § 8202(b)(2)(C)).

Department of Energy.  Miller of Cumberland avers that Cumberland's real estate department evaluated the $1.3 million offer using its normal procedures.  According to Miller, Cumberland acted in the normal course of business in accepting 880 CPA's offer because the terms were financially beneficial and outweighed the advantages of continuing to operate the gas station. Thus, Defendants argue the decision to sell the Premises was purely business related.

Plaintiff does not argue that the decision to sell to 880 CPA was done outside the "normal course of business."  Plaintiff contends that Cumberland did not act in good faith because Cumberland through Gulf Oil's Business and Asset Development Manager, Ronald Mals ("Mals"), made multiple oral representations to Plaintiff that the franchise would be renewed before deciding otherwise.  Plaintiff asserts that Cumberland's June 26, 2013, letter asking Plaintiff to make a bona fide offer to purchase the Property, followed closely by Gulf Oil's June 28, 2013, letter purporting to terminate the franchise for failure to operate for 7 consecutive days, evince Defendants' bad faith in seeking to divest Plaintiff of its franchise.  As to Plaintiff's failure to operate, DeRentis avers that the gas station closed for four months because Gulf Oil was replacing the gasoline storage tanks.  Neither party provides documentation showing how long the station was closed.  Gulf Oil, however, never followed through with the termination of the franchise because Cumberland sought to divest itself of the Premises.  Moreover, Defendants proffered evidence to demonstrate that in October 2012 the principals of 880 CPA began to inquire about the availability of the premises and Defendants' willingness to sell it.  Such evidence tends to strongly suggest that the sale of the Premises was unrelated to Plaintiff's alleged failure to comply with the franchise operating agreement.

Plaintiff alternatively asserts that Cumberland tried to evict Plaintiff in order to make the negotiations with 880 CPA more lucrative.  However, DeRentis already knew by June 19, 2013,

8

that Cumberland had received a $1.3 million offer, and Plaintiff provides no evidence that Cumberland sought a higher sales price from 880 CPA.  The June 28 letter purporting to terminate the franchise is the only piece of evidence to which Plaintiff clings in speculating that Cumberland attempted to negotiate a more lucrative contract.[4]

Plaintiff finally asserts that the terms of the contract Cumberland offered were materially different because (a) the financing provision was different and (b) the 880 CPA sales contract did not include the Mutual Termination agreement.  Notably, the financing provision is more favorable to Plaintiff.  Although Cumberland offered to sell the Premises to Plaintiff for the same $1.3 million purchase price, it lowered the down payment from $750,000 to $130,000.  All other substantive provisions remained the same.  Since Cumberland sought to divest itself of the Premises, it also sought to divest itself of the franchise relationship with Plaintiff, thus requiring Plaintiff to execute the Mutual Termination agreement.  The Mutual Termination was necessary because Cumberland sought to execute the Premises sale contract with Plaintiff by November 6, 2013, before the franchise agreements were to expire.  Furthermore, Plaintiff could have negotiated the term relinquishing its claims against Gulf Oil with Gonsalves, as she had made herself available for such discussions.  Plaintiff's failure to contact Gonsalves to negotiate is insufficient to impute bad faith to Defendants.

Accordingly, the Court finds Defendants are likely to succeed on their PMPA claim.

---

[4] It is also the one concrete piece of evidence Plaintiff uses in weaving its conspiracy theory that former defendant Kirmani was in collusion with Defendants to increase Kirmani's market share—which, in any event, is wholly unrelated to the sale of the Premises at issue.

### 2. Lanham Act Counterclaim

Defendants claim that Plaintiff's continued use of the Gulf trademark now that Plaintiff is no longer an authorized franchisee constitutes trademark infringement.  Under the Lanham Act, any person who without permission

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

is liable to the owner of the trademark.  15 U.S.C. § 1114(1)(a).  To succeed on their claims, Defendants must show (1) that their trademark is entitled to protection, and (2) that "use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)).

As to the first element, registered trademarks are "presumed distinctive and should be afforded the utmost protection."  *Lois Sportswear, U.S.C., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986).  Here, Defendants provide documents from the U.S. Patent and Trademark Office showing the Gulf trademark was registered February 21, 1956, and most recently renewed for a ten-year term on April 7, 2006.

As to the second element, several district courts have held that continued use of a trademark after a franchise agreement ends is likely to cause consumer confusion because "[a] franchisee's use of the franchisor's marks is unauthorized if the franchisor properly terminated the franchise agreement."  *7-Eleven, Inc. v. Khan*, No. 13-CV-3538 (ADS) (ARL), 2013 WL 5585007, at *19 (Oct. 10, 2013) (quoting *7-Eleven, Inc. v. Dhaliwal*, No. 12-CV-02276-KJM-GGH, 2012 WL 5880462, at *5 (E.D. Cal. Nov. 21, 2012)); *Dunkin Donuts Franchised*

*Restaurants LLC v. Tim & Tab Donuts, Inc.*, No. 07-CV-3662 (KAM) (MDG), 2013 U.S. Dist. LEXIS 83798, at *23 (E.D.N.Y. Sept. 15, 2009); *accord McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998).  Here, the Court has previously found that Defendants are likely to prevail on their counterclaim seeking a declaration that they complied with the nonrenewal provisions of the PMPA, and thus properly terminated the Plaintiff's franchise. Defendants are also likely to succeed on their Lanham Act claim, since it is undisputed that Plaintiff continues to operate his station as a Gulf gas station even after the franchise agreements expired.  Consumer confusion is highly likely because Plaintiff is not purchasing gasoline from Gulf Oil as the franchise agreements required.  Plaintiff has failed to proffer any objective evidence that it is purchasing "Gulf branded petroleum" other than the affidavit of DeRentis, who fails to identify the source of the petroleum.

### B. Irreparable Harm

Defendants assert that "unauthorized interference with both real and intellectual property constitutes irreparable harm as a matter of law," *TR Petroleum, LLC v. Sunoco, Inc.*, No 07-CV-475 (FB) (ARL), 2008 WL 897702, at *2 (E.D.N.Y. Mar. 31, 2008) (citing *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute."); *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004) ("There is a compelling need for injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder.")); *accord Brooklyn*

11

*Heights Ass'n v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 435 (E.D.N.Y. 2011) ("[U]nauthorized interference with a real property interest constitutes irreparable harm as a matter of law.").

Defendants point to several decisions granting preliminary injunctions to enjoin franchisees from holding over because continued occupation deprives the franchisor of the enjoyment of their real estate.  For instance, in *Persaud v. Exxon Corp.*, 867 F. Supp. 128, 132–35 (E.D.N.Y. 1994),  a gas station franchisee facing financial hardship signed a written agreement to end the franchise but remained on the premises past the agreed-upon termination date.  There, the court found that the franchisee continuing to occupy the property deprived the franchisor of "the ability to make productive use" of the property and that absent a court order the franchisor faced the immediate risk of "inability to exercise control and supervision over the gasoline tanks, pumps and related equipment" on site.  *Id.* at 141.  Likewise, in *Gulf Oil Limited Partnership v. Semerci*, No. CV-12-4731 (SJF) (WDW), 2013 WL 394893, at *2–3 (E.D.N.Y. Jan. 30, 2013), a franchisor sent notice of termination to the franchisee after it undisputedly failed to operate its gas station as required by the lease, but the franchisee refused to vacate the premises.  The court found irreparable harm in the franchisee's occupancy of the gas station, as the franchisor was deprived of its ability to make productive use of its land.  *Id.* at *5.  The court also found that the franchisee's failure to operate the station as required caused harm to the franchisor's good will such that the franchisor would suffer irreparable harm if not permitted to take possession of its own property.  *Id.* at *6.

Here, Defendants assert deprivations of their interest in the Premises, their ability to make productive use of the Premises, and their right to control potentially hazardous conditions in light of recent deliveries of gas that over-filled the underground gas tanks.  They assert further

that Plaintiff's continued use of the Gulf brand after the franchise agreements expired is damaging their goodwill and reputation.

Plaintiff, on the other hand, contends there has been no "unauthorized interference" with Defendants' proprietary interests.  Plaintiff asserts it acted within its rights while Defendants acted in bad faith by informing Plaintiff the Premises would be sold but simultaneously terminating the franchise in June 2013.  Plaintiff also argues that Defendants did not inform Plaintiff "as soon as practicable" of the intention to sell the Premises after receiving the initial offer in October 2012.  *See* 15 U.S.C. § 8204(b)(1)(A) ("In circumstances in which it would not be reasonable for the franchisor to furnish notification [of termination or nonrenewal of a franchise], not less than 90 days prior to the date on which termination or nonrenewal takes effect, . . . such franchisor shall furnish notification to the franchisee affected thereby on the earliest date on which furnishing of such notification is reasonably practicable.").  Plaintiff's contentions not only lack merit and are of little value, but more importantly they do not address Defendants' showing of irreparable harm.  It should be noted that Plaintiff does not dispute that it received notification "not less than 90 days prior to" the intended termination date.  It is also undisputed that following of the notice of termination, Defendants took no further action.  Similarly, Plaintiff does not demonstrate that, despite representations that it intended to exercise its right of first refusal, it did not execute the requisite documents but instead conditioned the exercise of its right on the outcome of this litigation, thus altering the terms previously agreed upon in the franchise and lease agreements.

Because Plaintiff continues to occupy the Premises after refusing to enter into the contract of sale with Cumberland, and because this occupation and the instant action has operated to preclude the sale to 880 CPA under an arm's length transaction, Plaintiff is impeding

13

Defendants' ability to make productive use of their real property.  Likewise, Plaintiff's continued use of the Gulf trademarks while purchasing gas from sources unknown continues to cause irreparable injury to Cumberland's trademark of the Gulf logo.  Accordingly, Defendants have demonstrated irreparable harm if this injunction is not granted.

### C. Balance of Hardships

There is no doubt that Plaintiff has invested substantial time and money in operating the gas station on the Premises.  Thus, Plaintiff will undoubtedly suffer harm if the preliminary injunction is granted and Plaintiff has to vacate the Premises.  However, as previously noted, Defendants face irreparable harm in that they cannot make productive use of the Premises and their trademark is being infringed.  Plaintiff, on the other hand, has a remedy at law if it prevails, since it is seeking damages.  Moreover, based on the facts before the Court, the harm to Plaintiff stems from its "own wrongful conduct in passing off [its] product as a [Gulf Oil] product and continuing to capitalize on [Defendants'] . . . good will after termination of the [f]ranchise." *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 199–200 (E.D.N.Y. 2013). Accordingly, the balance of hardships weighs in Defendants' favor.

### D. Weight of Public Interest

Here the public interest also weighs in favor of Defendants.  "[T]he continued possession by a lessee of a property after the lease has been validly terminated is contrary to the public interest," especially where the property has underground gas tanks requiring "strict testing, record keeping, monitoring, and sampling" to avoid environmental harm.  *Total Petroleum P.R. Corp. v. Colon-Colon*, 577 F. Supp. 2d 537, 552 (D.P.R. 2008), *quoted in Semerci*, 2013 WL 394893, at *6.  Moreover, allowing the continued use of Defendants' registered Gulf trademark

14

without permission is contrary to both the letter of the law and public interest, as consumers are induced into purchasing gasoline from Plaintiff that is not Gulf gasoline. *Id.*

## III. CONCLUSION

Defendants' motion seeking a preliminary injunction is GRANTED. The Court hereby orders and directs that, within 15 days of this order, Plaintiff shall:

a. Vacate and surrender the Premises, along with all real property located thereupon, to Defendants Cumberland and Gulf Oil and not reenter the Premises;

b. Return all of Defendants' equipment, fixtures, and other property located at the Premises; and

c. Remove Plaintiff's personal property without harm to the Premises.

The Court further orders and directs that, within 7 days of this order, Plaintiff shall cease and desist from selling petroleum on the Premises. The Clerk of Court is requested to terminate this motion (Doc. 19).

Dated: March 7 , 2014
White Plains, New York

SO ORDERED:

_____ 3/7/14
NELSON S. ROMÁN
United States District Judge