```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SCARSDALE CENTRAL SERVICE INC.,          :
                                         :
                    Plaintiff,           :        13-cv-8730 (NSR)
         -against-                       :
                                         :        OPINION & ORDER
CUMBERLAND FARMS, INC. and GULF OIL      :
LIMITED PARTNERSHIP,                     :
                                         :
                    Defendants.          :
-----------------------------------------------------------------X
```

NELSON S. ROMÁN, United States District Judge:

Scarsdale Central Service Inc. ("Plaintiff") was a tenant and franchisee of Gulf Oil Limited Partnership ("Gulf Oil") and Cumberland Farms, Inc. ("Cumberland") (together, "Defendants"). Plaintiff operated a Gulf Oil gas station at 880 Central Park Avenue in Scarsdale, New York (the "Premises"). Gulf Oil is a subsidiary of Cumberland.

Plaintiff filed the instant suit against Defendants and other parties seeking, among other remedies, to enjoin Defendants' sale of the Premises to third-party 880 Central Park Avenue LLC ("880 CPA"), to enjoin Defendants from evicting Plaintiff from the Premises, to prevent Defendants from terminating the franchise relationship, and to order Defendants to honor Plaintiff's right of first refusal under terms consistent with a bona fide arm's length transaction. Plaintiff also seeks a declaration that the sales agreement with 880 CPA is invalid, and Plaintiff seeks damages under various tort and contract theories.

Defendants assert counterclaims, namely, a claim seeking a declaration that Defendants satisfied the nonrenewal requirements of the Petroleum Marketing Practices Act ("PMPA"), 15



U.S.C. §§ 2802, 2804, a trademark infringement claim under the Lanham Act, 15 U.S.C. § 1114(1), breach of contract and unjust enrichment claims, and a claim for attorneys' fees.

Defendants now move for summary judgment, seeking an order granting their counterclaims and dismissing all Plaintiff's claims. The Court previously granted Defendants' motion for a preliminary injunction due to Plaintiff's continued occupancy of the Premises and wrongful act of selling gasoline under the Gulf Oil trademark long after Gulf Oil ceased delivery to Plaintiff. The Court ordered Plaintiff to vacate and surrender the Premises, return to Defendants all property belonging to them, and remove Plaintiff's personal property without harming the Premises. *See* dkt. no. 40. The Court now GRANTS Defendants' motion for summary judgment in its entirety for the reasons set forth below.

## I. FACTS

The following facts are not in dispute, unless so noted, and are derived from the parties' summary judgment submissions and submissions on the motion for a preliminary injunction. Until 2001, the Premises were owned by non-party Exxon Corporation. Non-party J&V Central Service, Inc. ("J&V") operated the gas station as an Exxon franchisee. In 2001, Cumberland bought the Premises from Exxon, and J&V became a Gulf Oil franchisee. On or about December 1, 2010, J&V entered into the most recent franchise and lease agreements with Gulf Oil concerning J&V's occupancy of the gas station. These agreements were to expire on November 30, 2013. On April 19, 2012, J&V assigned to Plaintiff the Gulf Oil franchise and lease agreements.

Former defendants David Ross ("Ross") and Richard Becker ("Becker") own 880 CPA and its parent, Patio.com, a furniture store. On or about October 18, 2012, before forming 880 CPA, Ross made an unsolicited offer to Cumberland to purchase the Premises. On or about June

2

19, 2013, Cumberland's Real Estate Manager, JoAnne Miller ("Miller") emailed Plaintiff's principal, Jim DeRentis ("DeRentis"), disclosing the negotiations with Ross and Becker, and acknowledging Plaintiff's possible interest in purchasing the Premises:

> As we discussed, there is a contract being negotiated at $1.3 million. Once all terms and conditions have been agreed to . . . you will be given a signed copy of the Purchase and Sales Agreement. . . . [I]f you are interested in submitting an offer please send it to my attention.

*See* Affidavit of Joanne Miller ("Miller Aff.") Ex. 1.

On June 26, 2013, Cumberland's Director of Real Estate Acquisitions and Divestments, Deborah Gonsalves ("Gonsalves"), further informed Plaintiff by letter that Cumberland had decided to divest the Premises and that Plaintiff had thirty days to submit an offer to purchase the property. *See* Plaintiff's Opposition Memorandum ("Opp. Mem.") Ex. B. The letter said Cumberland was not obligated to accept Plaintiff's offer, but if Cumberland contracted with a third party, Plaintiff retained its right of first refusal under the PMPA. *Id.*

Separately, on June 28, 2013, Gulf Oil, through its Regional Director of Dealer Sales Operations and Property Management, Rich Watts ("Watts"), notified Plaintiff by letter that the franchise relationship would terminate October 7, 2013, purportedly because Plaintiff had failed continuously to operate the gas station at the Premises, by not dispensing fuel for at least seven consecutive days. *Id.* Ex. C. This letter was sent on behalf of Cumberland and on Cumberland letterhead.

With respect to the purported non-operation of the gas station, Plaintiff claims it ceased operations for four months in the fall and winter of 2012, because Cumberland required Plaintiff to close the gas station so that Cumberland could install new oil storage tanks. Plaintiff does not proffer evidence, however, of such tanks having been installed successfully, or of the impact that

work had on the environment surrounding the tanks. In any event, after transmission of the June 28, 2013 letter citing non-operation as a basis to terminate the franchise, no further action was taken on that basis. Defendants instead decided to move forward with divestiture of the Premises, which provided separate and independent grounds to terminate the franchise under the PMPA.

On July 25, 2013, responding to the June 2013 notices concerning divestiture and ongoing negotiations with 880 CPA, Plaintiff offered Defendants $800,000 to buy the Premises, which was the August 16, 2010 appraisal value upon which Plaintiff's rent was based.[1] *Id.* Ex. D. By letter dated August 27, 2013, however, Cumberland formally notified Plaintiff that Cumberland had received a $1.3 million offer from 880 CPA. *See* Miller Aff. Ex. 3. The August 27 letter advised Plaintiff that, under the PMPA, Plaintiff had forty-five days to exercise its right of first refusal by making an offer to purchase the Premises at the same purchase price. *Id.* Barring that, the franchise would be "terminated and non-renewed effective December 9, 2013," 109 days later. *Id.* Cumberland attached a copy of the Revised Summary to Title I of the PMPA as published in the Federal Register, as well as a copy of the sales contract with 880 CPA. *Id.* Ex. 2, 3. The agreement with 880 CPA required a down payment of $750,000, with the remaining amount due at closing. *Id.* Ex. 2.

On October 11, 2013, Plaintiff commenced the instant action in New York Supreme Court, Westchester County, although the action later was removed to this Court. Plaintiff also sent a letter to Watts outlining Plaintiff's theory that Defendants were "conspiring" with former

---

[1] Rent increased annually throughout the term of the lease, as the value of the Premises was assumed to increase by 3% annually. For December 1, 2012 through November 30, 2013, rent was based on a property value of $848,720.

defendant and fellow Gulf Oil franchisee Syed Kirmani ("Kirmani")[2] to strip Plaintiff of the franchise in violation of the PMPA. *Id.* Ex. 4. Plaintiff claimed the $750,000 down payment was highly unusual and had been selected purposely, so that Plaintiff could not exercise its right of first refusal. Defendants allegedly knew Plaintiff was unable to make a down payment of that magnitude for cash flow reasons. Despite these accusations, however, Plaintiff informed Cumberland that Plaintiff would exercise its right of first refusal to match 880 CPA's $1.3 million offer. *Id.*

On October 24, 2013, Cumberland acknowledged Plaintiff's wish to exercise its right of first refusal and advised that Plaintiff would receive the same contract as 880 CPA had received, except that the down payment would be reduced dramatically to $130,000 to accommodate Plaintiff's financial condition. On October 28, 2013, Cumberland sent Plaintiff's counsel a proposed purchase and sale agreement for the Premises with the new down payment amount. *See* Affidavit of Deborah Gonsalves ("Gonsalves Aff.") Ex. 1. The remainder of the $1.3 million purchase price would still be due at closing. The only other difference was the inclusion of a Mutual Termination and General Release Agreement form attached to the sales contract, which would have resolved the instant litigation:

> [I]n consideration of Gulf [Oil] agreeing to relieve [Plaintiff] from the operation of [its] Retail Motor Fuel Outlet and to terminate all Contracts and Agreements, . . . [Plaintiff] releases Gulf [Oil] from any and all claims and causes of action which [Plaintiff] has or might have against Gulf [Oil], irrespective of the source thereof, and whether such claims or causes of action are now known or unknown.

*Id.* Cumberland requested that Plaintiff sign and submit the agreement, along with the down payment, by November 6, 2013. *Id.*

---

[2] On March 7, 2014, Plaintiff voluntarily discontinued the action against Kirmani, 880 CPA, Ross, and Becker. *See* dkt. no. 39.

5

On November 7, 2013, having not heard from Plaintiff, Gonsalves called Plaintiff's counsel to determine whether Plaintiff would purchase the Premises. Plaintiff's counsel allegedly raised the conspiracy accusations again and failed to discuss the proposed sales agreement. On November 8, 2013, Gonsalves wrote to Plaintiff's counsel requesting a response to the sale agreement by November 15, 2013, and noting that Plaintiff's failure to respond would be deemed a non-exercise of the right of first refusal. Gonsalves noted that she was available to discuss the agreement with Plaintiff's counsel but would not discuss other issues (i.e., the "conspiracy" accusations).

On December 9, 2013, the date upon which the nonrenewal of Plaintiff's franchise was to take effect, Defendants removed the instant action to federal court after not hearing further from Plaintiff's counsel. Until this Court's previous order directing Plaintiff to vacate the Premises, Plaintiff continued to occupy them without paying the monthly rent or use and occupancy, continued to purchase gasoline—but from an unknown vendor, not from Gulf Oil—and continued to sell gasoline using the trademarked Gulf Oil logo.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 states, in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party also may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support

the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party, which must identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

## III. DISCUSSION

### A. Counterclaim One – Declaratory Judgment Under the PMPA

Defendants' first counterclaim seeks a judgment declaring that the nonrenewal of Plaintiff's franchise was proper. Under the PMPA, "[p]rior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor shall furnish notification . . . to the franchisee . . . (2) . . . not less than 90 days prior to the date on which such termination or

7

nonrenewal takes effect." 15 U.S.C. § 2802(a), (b)(2). The franchisor must send notification by certified mail or hand delivery and must state its intent to terminate or not renew, the reasons for termination or nonrenewal, the effective date thereof, and a summary statement published in the Federal Register. 15 U.S.C. § 2802(c); *see also* 61 Fed. Reg. 32,786 (summary of PMPA Title I as set out by Department of Energy).

Permissible, statutory grounds for nonrenewal include "a determination by the franchisor in good faith and in the normal course of business . . . to sell [the] premises . . . ." 15 U.S.C. § 2802(b)(3)(D)(i)(III).[3] The "good faith" language is meant "to preclude sham determinations from being used as an artifice for termination or non-renewal." *Darling v. Mobil Oil Corp.*, 864 F.2d 981, 990 (2d Cir. 1989) (quoting S. Rep. No. 95-731 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 896). The "normal course of business" language requires that the franchisor's decision be "the result of the franchisor's normal business decision making process." *Id.* These two requirements provide protection from arbitrary and discriminatory nonrenewal, and yet "avoid judicial scrutiny of the business judgment itself." *Id.*

Separately, where the premises are leased to a franchisee, nonrenewal requires that the franchisor: (a) if applicable, "offer[] the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises," 15 U.S.C. § 2802(b)(3)(D)(iii)(II); or (b) make "a bona fide offer to sell, transfer, or assign to the franchisee [the] franchisor's interests in such premises, *id.* § 2802(b)(3)(D)(iii)(I). *See also*

---

[3] Another basis for nonrenewal is "failure by the franchisee to operate the marketing premises for (A) 7 consecutive days . . . ." 15 U.S.C. § 8202(c)(9)(A) (explaining "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" as contemplated in 15 U.S.C. § 8202(b)(2)(C)).

*Roberts v. Amoco Oil Co.*, 740 F.2d 602, 606 (8th Cir. 1984) (noting that "bona fide offer" requirement and aforementioned "good faith" requirement are "separate inquiries").

Defendants seek summary judgment on their first counterclaim based on record evidence that (1) they decided to sell the Premises in good faith and in the normal course of business, (2) they offered Plaintiff a right of first refusal and bona fide offer and gave Plaintiff forty-five days to exercise that right, and (3) they gave Plaintiff 109 days' notice of nonrenewal in writing by certified mail and hand delivery, stating the reason for the nonrenewal (divestiture) and providing an effective date for the nonrenewal and the summary statement set out by the Department of Energy.

### 1. Good Faith and in the Normal Course of Business

Cumberland submits that its real estate department evaluated the $1.3 million offer from 880 CPA using its normal procedures. *See* Miller Aff. ¶¶ 3-5. According to Miller, Cumberland also acted in the normal course of business in provisionally accepting 880 CPA's offer. The terms were financially beneficial and outweighed the advantages of continuing to operate the gas station through a franchisee. *Id.* ¶ 5. Defendants therefore argue that the "normal course of business" requirement is satisfied.

Plaintiff does not dispute that the decision to sell was made in the ordinary course. Plaintiff contends, rather, that Cumberland did not act in good faith and, separately, that Cumberland did not make Plaintiff any bona fide offer. Cumberland, through Gulf Oil's Business and Asset Development Manager, Ronald Mals ("Mals"), purportedly made oral representations to Plaintiff that the franchise would be renewed, while in fact a different decision was being made. *See* Opp. Mem. at 13-14. Also, the June 26, 2013 letter inviting Plaintiff to make an offer to purchase the Premises, followed closely by the June 28, 2013 letter notifying

9

Plaintiff of termination due to seven-day nonoperation, purportedly evidences bad faith. *Id.* Judging by the letters, Plaintiff argues, Defendants were developing a pretext to put Plaintiff out of business. *See id.*; *see also* Affidavit of James Derentis ("Derentis Aff.") ¶ 7.

Plaintiff's assertion that Cumberland made oral representations concerning renewal of the franchise is not compelling and does not raise an issue of material fact. The record establishes that Defendants were entertaining interest from Becker and Ross as early as 2012. It may therefore be true that representations Mals made to Plaintiff regarding likely renewal were premature. But that does little to establish bad faith. The evidence indicates, rather, that Defendants received an offer in the ordinary course, engaged in gradual discussions, and ultimately put pen to paper on a sale agreement in 2013 once 880 CPA was formed. As discussions advanced and terms crystallized, Defendants ceased any assurances to Plaintiff concerning renewal and instead notified Plaintiff in writing of the 880 CPA discussions.

Likewise, Plaintiff's assertion that the two June 2013 letters suggest pretext and bad faith is unsupported speculation that does not raise a material factual issue. DeRentis' cousin, David Linn, submits based on secondhand knowledge that the gas station closed for four months because Gulf Oil was performing environmental and construction work on the property. *See* Affidavit of David Linn ("Linn Aff.") ¶ 4. DeRentis submits the same. *See* DeRentis Aff. ¶ 12. Neither party provides documentary evidence confirming how long the station was closed or any evidence demonstrating what the outcome of this work was. But ultimately, for franchise termination purposes, it does not matter. Defendants' letters cited two distinct bases upon which to terminate the franchise, which they wanted to do in their business judgment. The fact that Defendants initially pursued two bases for termination, and that one basis later became redundant, does not suggest something nefarious. Defendants had every right to exercise their

business judgment to terminate on whatever permissible grounds existed. Eventually, Defendants abandoned the nonoperation basis and pursued statutory prerequisites to seek to terminate the franchise relationship on grounds of divestiture. Without more, the coincidental timing of the two letters and the dual bases for pursuing franchise termination do not evidence bad faith. The Court finds no material issue of fact as to Defendants having decided in good faith and in the normal course of business to sell the Premises.

### 2. Bona Fide Offer to Sell

Plaintiff also argues, for the first time on summary judgment, that Defendants did not satisfy the separate statutory requirement of either (a) a right of first refusal, or (b) a bona fide offer to sell. As noted, having made a good faith decision to sell to a third-party, Defendants must have extended a right of first refusal, if applicable, thereby permitting Plaintiff to buy the Premises on the same terms as were offered to the third-party, *or* Defendants must have made a bona fide offer to sell the Premises to Plaintiff. *See Atlantic Avenue Oil & Gas Co., Ltd. V. Texaco Refining & Mktg., Inc.*, 699 F. Supp. 27, 31 (E.D.N.Y. 1988) (collecting authorities). Plaintiff argues that the notion of a right of first refusal does not apply here, since the agreement with 880 CPA was for land only. The agreement with 880 CPA (and the proposed agreement with Plaintiff) stated that Defendants would dispose of all personal property—including certain equipment necessary for further fuel sales (e.g., storage tanks)—and that Defendants would absorb the cost of any related environmental remediation. Plaintiff argues that because they could not adopt the equipment-removal provision without it gutting their business, there is no possible exercise of the right of first refusal that could have protected Plaintiff's interests, such that the right is simply inapplicable. As to whether there was a bona fide offer to sell Plaintiff the Premises, Plaintiff contends the offer was not bona fide, also because of the equipment-

removal provision in the proposed agreement. *See Roberts v. Amoco Oil Co.*, 740 F.2d 602, 607 (8th Cir. 1984) ("[A]s a matter of law . . . a bona fide offer to sell leased marketing premises under the PMPA must include the gasoline tanks, storage tanks, dispensers, and other equipment.").

Even assuming *arguendo* that the "right of first refusal" statutory subsection does not apply here, the Court finds that Defendants made a bona fide offer to sell Plaintiff the Premises. To the extent that the Eighth Circuit's opinion in *Roberts* holds differently, this Court declines to follow that authority. The Court instead adopts the reasoning in *Atlantic Avenue* and *Tobias v. Shell Oil Co.*, 782 F.2d 1172 (4th Cir. 1986). Those cases stand for the proposition that "the franchisor need not offer the franchisee those items of property on the premises that pose a threat of future pollution and liability." *Atlantic Avenue*, 699 F. Supp. at 31; *see also Tobias*, 782 F.2d at 1174 (franchisees' rights do not include the right to environmentally hazardous storage tanks in use at the time of the offer to sell).

The proposed sale agreement allocated to Defendants the responsibility for removing "underground storage tanks, the canopy, the lines, pumps, pump islands and related equipment . . . in compliance with the applicable federal, state and local laws and regulations." Miller Aff. Ex. 2 ¶ 12. The agreement also allocated to Defendants the cost of any remediation resulting from environmental contamination. *Id.* The record contains no direct evidence explaining why this provision was included in the document. Plaintiff has not proffered evidence demonstrating that the work done during the 2012 station closing eliminated future environmental contamination risk. Nor has Plaintiff proffered admissible parol evidence, as opposed to mere speculation, as to the reasoning behind the tank-removal and remediation provision. Absent such evidence, the plain meaning and the obvious significance of the contract provision carry the day. The

provision's import becomes especially clear when compared against possible sources of liability for environmental contamination.

In particular, the New York Navigation Law (a/k/a the "Oil Spill Act") imposes statutory strict liability on parties "who ha[ve] discharged petroleum." N.Y. Nav. Law § 181(1). A viable Section 181(1) claim requires that: (i) the defendant is a "discharger"; (ii) a discharge of petroleum occurred; and (3) the discharge contaminated property. *Lambrinos v. Exxon Mobil Corp.*, No. 00-cv-1734, 2004 U.S. Dist. LEXIS 19598, at *19 (N.D.N.Y. Sept. 29, 2004) (summarizing New York state authorities). Notably, the New York Court of Appeals has extended potential Section 181(1) liability to both prior owners and successor-owners of gasoline stations and underlying property. *See New York v. Speonk Fuel, Inc.*, 3 N.Y.3d 720, 724 (2004); *see also Sunrise Harbor Realty, LLC v. 35th Sunrise Corp.*, 86 A.D.3d 562, 565 (App. Div. 2011) ("[A] landowner who purchases the property after a spill occurred may be liable if it did nothing after it learned of the discharge and the need for a cleanup.").

Contemplating successor ownership of property that housed a gasoline station, 880 CPA understandably would have been reluctant to incur potential liability under the Oil Spill Act or comparable law, without providing for remediation or indemnification. Likewise, Gulf Oil and Cumberland, as the prior owner-franchisor of the Premises, would have wanted to ensure that tank removal and remediation occurred, upon divestiture, or to provide for indemnification.

In other words, although Plaintiff now frames the tank-removal provision as having been a deal-breaker, that *post hoc* characterization does not mean the provision was a creature of bad faith or some "conspiracy" to put Plaintiff out of business. Rather, the provision falls squarely within the category of contract terms the *Atlantic Avenue* and *Tobias* courts held do not undercut the bona fides of an offer to sell. In fact, the reasoning in those decisions applies *a fortiori* here,

where the record demonstrates that Plaintiff had opportunities to clarify the contract provision's application to any essential above-ground equipment, or to negotiate refinements of the provision, and Plaintiff did not do so.  *See* First Affidavit of Deborah Gonsalves ("First Gonsalves Aff.") Ex. 2 ("I will not address any issues *other than the Agreement* . . . .") (emphasis added).  Nor does the Court find compelling Plaintiff's argument that the allocation of equipment-removal and remediation costs to Defendants had distorted the sale price.  That argument is entirely speculative and is not grounded in any record evidence.  *See Anderson*, 477 U.S. at 248 (if the moving party fulfills its preliminary burden, the onus shifts to the non-moving party).

In sum, the Court finds no issue of material fact concerning Defendants' good faith and normal course decision to sell the Premises.  The Court also finds that Defendants extended Plaintiff a bona fide offer to sell the Premises.  Defendants likewise followed other statutory prerequisites to franchise termination on grounds of divestiture, and, consequently, they terminated the franchise in accordance with the PMPA.  The Court grants Defendants' motion for summary judgment on counterclaim one.

### B. Counterclaim Four – Infringement of Federally Registered Trademarks Under the Lanham Act

Moving to counterclaim four, Defendants allege that Plaintiff's continued use of the Gulf Oil trademark after franchise termination amounted to trademark infringement.  Under the Lanham Act, any person who, without permission

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

is liable to the owner of the trademark.  15 U.S.C. § 1114(1)(a).  Defendants must show (1) that their trademark is entitled to protection, and (2) that "use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993)).

On the first element, registered trademarks are "presumed distinctive and should be afforded the utmost protection."  *Lois Sportswear, U.S.C., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986).  Defendants have provided documents from the U.S. Patent and Trademark Office showing the Gulf trademark was registered February 21, 1956, and most recently renewed for a ten-year term on April 7, 2006.  This evidence is unrebutted.

On the second element, several district courts have held that continued use of a trademark after a franchise agreement ends is likely to cause consumer confusion because "[a] franchisee's use of the franchisor's marks is unauthorized if the franchisor properly terminated the franchise agreement."  *7-Eleven, Inc. v. Khan*, No. 13-CV-3538 (ADS) (ARL), 2013 WL 5585007, at *19 (Oct. 10, 2013) (quoting *7-Eleven, Inc. v. Dhaliwal*, No. 12-CV-02276-KJM-GGH, 2012 WL 5880462, at *5 (E.D. Cal. Nov. 21, 2012)); *Dunkin Donuts Franchised Restaurants LLC v. Tim & Tab Donuts, Inc.*, No. 07-CV-3662 (KAM) (MDG), 2013 U.S. Dist. LEXIS 83798, at *23 (E.D.N.Y. Sept. 15, 2009); *accord McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998).  As previously discussed, Defendants properly terminated Plaintiff's franchise on or about December 9, 2013.  Plaintiff concedes that it continued to operate a gas station on the Premises after that date.  Also undisputed, Gulf Oil stopped supplying Plaintiff with gasoline on or about December 9, 2013, as was Gulf Oil's right because the franchise had ended.  Gulf Oil's final, December 9, delivery was for a limited amount of gasoline.  Thereafter, Plaintiff purchased

gasoline from an unknown third-party supplier and continued to sell gasoline. Plaintiff does not deny this. Plaintiff therefore admittedly operated as a putative Gulf Oil franchisee until at least March 2014.

Defendants have met their burden by demonstrating the apparent, unauthorized sale of third-party gasoline at the Premises, which amounts to unauthorized use of the registered Gulf Oil trademark and constitutes infringement under the Lanham Act. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("the use of a mark by a former licensee confuses and defrauds the public"). In response, Plaintiff relies on the record's silence as to the identity of the third-party supplier. Plaintiff also relies upon self-serving statements indicating that the third-party gasoline may have been Gulf Oil product, which could undercut the Lanham Act claim under the "first sale doctrine." *See* DeRentis Aff. ¶ 13 ("I have no knowledge of any gasoline products being sold by SCS at the Premises other than Gulf branded petroleum."); Linn Aff. ¶ 12 (station manager "indicated" to Linn that the gasoline "was Gulf gas product"). Plaintiff's submission is insufficient to rebut the record evidence of trademark infringement. Plaintiff cannot forestall summary judgment simply by concealing the identity of the third-party supplier, where Plaintiff is in the best position to identify that supplier. Once Defendants meet their preliminary burden of demonstrating infringement, as they have done here with circumstantial evidence, the onus is on Plaintiff to produce evidence demonstrating that there actually was no infringement. *Anderson*, 477 U.S. at 248. Plaintiff has produced no such evidence; the DeRentis and Linn statements do not suffice. Those statements are foundationless and have little, if any, evidentiary value. Accordingly, the Court grants Defendants' motion for summary judgment on counterclaim four.

### C. Counterclaims Two, Three and Six: Breach of the Lease and the Supply Contract and Unjust Enrichment

Defendants also move for summary judgment on counterclaims two and three and on grounds of unjust enrichment. Counterclaim two alleges that Plaintiff breached the operative real property lease by failing to pay holdover rent for the months following November 2013, when Plaintiff remained on the Premises. Counterclaim three alleges that Plaintiff breached its supply contract with Gulf Oil by failing to pay for deliveries of gasoline Gulf Oil made to the Premises on November 22, 2013 (gasoline worth $16,755.83) and November 27, 2013 (gasoline worth $29,920.59).

It is undisputed that Plaintiff continued to occupy the Premises from December 2013 through at least early 2014, and that Plaintiff failed to pay rent or use and occupancy during that time. *See* Affidavit of Ronald Mals ("Mals Aff.") Ex. 5. Likewise, Plaintiffs have failed to rebut with proof of payment the evidence of two November 2013 gasoline deliveries. *See id.* Ex. 5-6. Any defense Plaintiff might have to liability for the delinquent rent, use and occupancy, and gasoline cost, rises and falls—and here, falls—with the Court's conclusion concerning proper franchise termination. That conclusion, the operative contract terms, and the most basic unjust enrichment principles compel summary judgment for Defendants for the amounts due in unpaid rent and gasoline costs. The Court grants Defendants' motion for summary judgment on counterclaims two and three. As an alternative avenue to the same relief, the Court also enters summary judgment for Defendants on counterclaim six, which advances an unjust enrichment theory.[4]

---

[4] Defendants do not expressly move for summary judgment on the dual (duplicatively-numbered) counterclaims five, which assert "false designation of origin pursuant to 15 U.S.C. § 1125(a)" and "unfair competition." The Court therefore does not address those counterclaims.

### D. Attorneys' Fees and Costs

Next, Defendants seek an order awarding them reasonable attorneys' fees and costs. The operative real property lease, which incorporates the supply contract by reference, provides that the lessee, Plaintiff, "shall reimburse [Gulf Oil] for all reasonable costs (including all attorneys' fees) that [Gulf Oil] incurs in enforcing its rights and remedies under this Lease." *See* Mals Aff. Ex. 1 ¶ 19. Gulf Oil's rights under the lease include the right not to renew, after any notice required by law. *Id.* ¶ 12. The lease also affords Gulf Oil the right to collect rent. *Id.* ¶ 3.

Through its counterclaims and other pleadings, Gulf Oil has sought to vindicate its rights not only under the PMPA and Lanham Act, but also under the lease and supply agreement. By virtue of this Court's summary judgment decision on the above counterclaims, Gulf Oil and its parent, Cumberland, successfully have enforced cognizable rights and remedies under the lease and supply agreement. Accordingly, Gulf Oil is entitled to reasonable attorneys' fees and costs under the plain language of the lease and supply agreement. Because Defendants are seeking this recovery by contract, and not under the PMPA, Plaintiff's argument in opposition misses the mark. *See Cumberland Farms, Inc. v. Lexico Enters., Inc.*, 10-cv-4658, 2012 U.S. Dist. LEXIS 19890, at *9-10 (E.D.N.Y. Feb. 16, 2012) (contractual fee-shifting provision "evinces a clear intent" to indemnify for the cost of enforcing rights and remedies under the contract). The Court grants Defendants' motion for summary judgment on their claim for attorneys' fees and costs.

### E. Plaintiff's Claims

Plaintiff's First Amended Complaint (dkt. no. 37) seeks relief under the PMPA (claims one and two), by contract (claim three), for tortious interference with contract (claim four), in the form of declaratory relief (claim five), on grounds of fraud (claim six) and unfair competition (claim seven), and for a breach of the implied warranty of good faith and fair dealing (claim

18

eight). Each of these claims attempts to piggyback on the aforementioned argument that Defendants did not act in good faith when they decided to terminate the franchise agreement and sell the Premises.

Claims one and two fail based on the above PMPA analysis and the Court's conclusion that Defendants properly terminated the franchise. Claim three fails based on the above contract analysis and the conclusion that Defendants properly exercised their rights under the operative contracts. The remaining claims, one through four, sound in tort. Plaintiff argues that the claims raise issues of material fact. The Court disagrees. As Plaintiff acknowledges, each of these claims requires an absence of good faith, i.e., some form of malice or scienter. In that regard, the above conclusions concerning good faith and a bona fide offer to sell are dispositive. There is simply no evidence that Defendants acted in bad faith, made any knowingly false representation, or otherwise dealt with Plaintiff in a legally unfair manner. Speculation and argument to the contrary do not sustain a tort claim in the absence of actual evidence. The Court grants Defendants' motion for summary judgment as to all eight claims asserted in the amended complaint, thereby dismissing those claims.

## IV. CONCLUSION

Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of Court is respectfully requested to terminate the motion at docket number 66. On or before March 6, 2015, Defendants shall file an appropriately-supported application for damages, encompassing: damages sought under the Lanham Act; unpaid rent and payment due for gasoline deliveries; and attorneys' fees and costs. By March 27, 2015, if necessary, Plaintiff shall file an opposition memorandum concerning Defendants' calculation of damages. The Court will issue an order thereafter or schedule a hearing if required.

Dated: February 13, 2015
      White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge